Matter of Sydney H. (2025 NY Slip Op 50655(U))

[*1]

Matter of Sydney H.

2025 NY Slip Op 50655(U)

Decided on March 26, 2025

Surrogate's Court, Suffolk County

Messina, Jr., S.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 26, 2025
Surrogate's Court, Suffolk County

In the Matter of the Guardianship of Sydney H., Pursuant to SCPA Article 17-A.

File No. XXXXX

Brian A. Wellington, Esq.
Mental Hygiene Legal Service
Attorneys for Petitioner
320 Carleton Avenue, Suite 3200
Central Islip, New York 11722
John P. Graffeo, Esq.
Guardian ad Litem
202 East Main Street, Suite 208
Huntington, New York 11743
Kimberly A. Kinirons, Esq.
Suffolk Regional Office of
NYS Attorney General's Office
300 Motor Parkway, Suite 230
Hauppauge, New York 11788

Vincent J. Messina, Jr., S.

In this miscellaneous proceeding, Sydney H. ("petitioner") seeks an order discharging the guardian and terminating the guardianship, pursuant to SCPA 1759(2). 
Background
Previously, by decree of this court dated, October 2, 2014, Sydney H. was found to be a developmentally disabled person within the provisions of Article 17-A of the SCPA. Pursuant to such decree, letters of guardianship of the person issued to Rebecca H., Sydney's mother. The letters were subsequently amended twice to reflect the guardian's change in marital status only. The most recent Amended Letters of Guardianship of the person of Sydney H. were issued to Rebecca C., on January 25, 2019.
Sydney H., the ward, who was previously determined to be developmentally disabled, filed the within action by filing a petition on February 7, 2024. Petitioner is represented by Mental Hygiene Legal Service Second Judicial Department ("MHLS")in this matter. It is alleged that petitioner, who is 29 years old, has matured and increased his independence since the time [*2]the decree was entered ten years ago. It is further alleged that he does not need a guardian because he has support from his grandfather, his aunt, a friend and his team of providers to aid him in decision-making processes and he is willing to accept that support. In recognition of these facts, the guardian has consented to the termination of the guardianship. The guardian, who permanently relocated to Virginia approximately two years ago and does not play an active role in petitioner's daily life, executed a waiver and renunciation indicating her consent to all of the relief sought in the petition, including termination of the guardianship. She had also previously executed a "stipulation of settlement" agreeing to termination of the guardianship, which was signed by herself, the petitioner and petitioner's counsel.
Notice of the proceeding to terminate the guardianship was served upon the Office of the Attorney General and the executive director of the facility in which petitioner resided at the time, a group home managed by the Independent Group Home Living Program, Inc. ("IGHL"). Proof of said service was received by the court. 
Jurisdiction has been obtained over all necessary parties and no one has appeared in opposition to the relief requested by petitioner. By order dated and filed April 15, 2024, the court appointed a guardian ad litem to represent the interests of the petitioner. The guardian ad litem was appointed to conduct an investigation into the facts and circumstances of the underlying proceeding and report his conclusions and recommendations to the court concerning the relief sought.
The guardian ad litem submitted a report on June 28, 2024, wherein he detailed his extensive investigation in this matter, waived his fee for legal services and recommended the court hold a hearing in order to determine the matter. The guardian ad litem noted in his report that both he and the house manager were 99% confident that the guardianship can be terminated, but have a 1% concern that if the guardianship is terminated his safety would be in jeopardy if he were to "sign himself out of the group home or discontinue his medications."
Although the guardian ad litem recommended that the letters of guardianship should be revoked since the guardian evidenced that she no longer wishes to serve, he recommended the matter be set down for a hearing because the ward clearly preferred to have the guardianship terminated rather than appointing a successor guardian. The guardian ad litem noted, "while I believe that my Ward has matured and developed skills to increase his ability to independently care for himself to a much greater extent than ten years ago, I also believe that he lacks the ability to completely care for himself without any of the support that he has now." The guardian ad litem felt that a hearing would assist the court in making its determination and would give the petitioner an opportunity to be heard since the previous determination was made without a hearing.

Hearing
Pursuant to SCPA 1754 and 1759, a hearing was commenced on September 25, 2024 and continued on January 16, 2025. At the hearing were, petitioner, petitioner's attorney, the guardian ad litem, and three witnesses. During the course of the hearing, the three witnesses testified on behalf of the petitioner, and the report and supplemental report of the guardian ad litem were entered into evidence.
Gia O., the house manager of the IGHL group home that petitioner resided in at the time of the hearing, was the first witness to testify. She has known petitioner since he began residing [*3]in the group home nine years ago and sees him three to five times a week. 
The second witness was Lewis C., petitioner' maternal grandfather, who visits with the petitioner every other month and speaks to him on the phone multiple times a week. The grandfather has participated in all of the bi-annual meetings as well.
Amanda F., the petitioner's maternal aunt was the third witness. Similar to the grandfather, the aunt regularly speaks to the petitioner, visits him a few times a year, and has participated in the bi-annual meetings.
All three witnesses testified similarly. All three of the witnesses testified to the following: 1) The guardian has been largely absent in her duties for several years; 2) In the guardian's absence petitioner has been making his own decisions for the last two or three years and appears to be making appropriate choices; 3) The petitioner has matured and his decision making process had improved greatly in the last few years; 4)The petitioner has learned to rely on others for support and information in making important life decisions; 5)It is in his best interests not to have a guardian because he is capable of making his own decisions; 6)The petitioner is capable of living independently, making his own medical appointments, and dispensing and taking his medications without the help of others, which had not been the case previously; 7)The petitioner no longer refuses medication or tries to elope from the group home and has learned to verbalize when he has problems rather than engage in negative behaviors; 8)The petitioner was scheduled to move into an apartment through Maryhaven, an agency similar to IGHL, on October 15, 2024, a date after the first day of testimony; 9)The Maryhaven apartment is a less restrictive environment where petitioner can be more independent; 10)Moving to the Maryhaven apartment was a decision that petitioner had made on his own; 11)They believe that if the guardianship were terminated, petitioner would continue to attend medical appointments and take his prescribed medications properly; 12)They do not believe that petitioner would attempt to harm or danger himself in any way; and 13)They also believe that petitioner is capable of making his own medical and residential decisions, as well as who to socialize with and to consent to a romantic relationship.
Further, the aunt testified that petitioner is more rational and less impulsive than before. His reasoning has improved and he can control his temper better. The grandfather and the aunt both indicated that they would continue to support petitioner if the guardianship was terminated.
The house manager provided more detailed testimony as to the specifics of petitioner's residential situation, daily routine, and life activities. She testified that at the time of the hearing, the petitioner resided in a group home that houses ten high-functioning mentally handicapped individuals. She further testified that petitioner has his own room and is one of the higher functioning residents.
She explained that both IGHL and Maryhaven conducted an assessment of petitioner and determined that he can stay home alone continuously without staff, he can live in an apartment and he is a person who is capable of consenting to a sexual relationship. Presently, he takes medications on his own and makes some of his own medical appointments. He also handles activities of daily living without assistance, can travel alone in the community by Suffolk County Accessible Transportation ("SCAT") bus to visit friends in other towns, and is employed at a warehouse managed by IGHL.
Not only does he prepare his own food daily, but the house manager explained that he [*4]often cooks for others in the group home, using the oven, microwave and air fryer. Some of the meals he prepares are tacos, pizza and egg sandwiches with sausage. He does not currently do his own grocery shopping, but will have to do so when he moves to Maryhaven during the pendency of the action.
It was explained that unlike his current residence, the staff that provide services at the Maryhaven apartment are present for 5 hours a week, instead of 24 hours a day as at IGHL. However, Maryhaven staff would be accessible if needed outside of the scheduled five hours. Additionally, he will reside with only one other person, instead of nine.
Further, the petitioner's care manager works for a separate organization, not IGHL, and thus he will still have her services when he moves. The care manager handles his life plan meetings and any services he may need. If the guardianship is terminated petitioner will have to make all of his own doctor appointments but Maryhaven will have some supervision to ensure his medical needs are met.
The house manager was also questioned about her being 99% confident that the guardianship can be terminated, but having a 1% concern that if the guardianship is terminated petitioner's safety would be in jeopardy. She explained that it was more of a parental instinct any time some individual goes off and lives on their own. She compared the situation to how she felt when her own children left the house. She noted that petitioner has some limitations in learning, but he now recognizes that he has limitations.
The report and supplemental report of the guardian ad litem were consistent with the testimony elicited at the hearing. The reports also contained specific details the petitioner relayed to the guardian ad litem regarding his living and work situation, as well as his ability to make his own decisions.
In his initial report, the guardian ad litem detailed what transpired in the previous guardianship proceeding that resulted in the issuance of the letters of guardianship, as he was also the guardian ad litem in that matter. He notes that he has not had any contact with the petitioner since the previous proceeding concluded in 2014.
The guardian ad litem then detailed his meeting with the ward at the ward's place of employment, at which petitioner's counsel was also present. The guardian ad litem had an extensive conversation with the ward regarding his residential history, his desire for more independence, his activities of daily living, and his employment. The guardian ad litem also had conversations with the petitioner's maternal grandfather and the house manager of the group home where petitioner resided.
In his supplemental report, the guardian ad litem briefly detailed the testimony given during the hearing. He then detailed a Freedom of Information Law ("FOIL") request he made to the local police department prior to the first hearing date, which was not responded to until afterward. He also detailed information obtained from subpoenas he had issued to local hospitals based upon the information received in response to the FOIL request.
As the petitioner had moved to the Maryhaven apartment between the first and second dates of the hearing, the guardian ad litem conducted a further meeting with the petitioner in his new residence. The guardian ad litem described the living space and confirmed that the petitioner is much happier with his new living situation. He confirmed that petitioner has an apartment manager who visits several times a week and who is available to petitioner via text [*5]whenever she is not present. He also detailed conversations he had with the petitioner concerning the information in the FOIL request and subpoenas and his opinion that those documents did not alter his conclusion or recommendation. 
The guardian ad litem reiterated his conclusion that the guardian should be removed, as she no longer wishes to serve and has executed paperwork to that effect. In the supplemental report the guardian ad litem recommended that the guardianship be terminated in its entirety based upon the changes in circumstances that have been documented. 
These changes in circumstances include that petitioner is "residing in an apartment with just one other roommate and without twenty-four hour supervision from any staff support." He appears to be doing well in this situation. Also, the aunt has made it clear that she provides support for the petitioner and will undertake any necessary measures to ensure his safety and welfare should it become necessary. Finally, the guardian ad litem believes that the medical records demonstrate that the petitioner knows how to seek help when he needs it or to remove himself from a stressful situation.
The guardian ad litem concluded that petitioner "has developed life skills that allow him to care for himself with moderate to minimal assistance from others." The guardian ad litem further concludes that it appears illogical to continue the guardianship in light of the fact that the petitioner resides in a private residence with just one roommate and maintains a proper daily routine. The guardian ad litem believes that there are sufficient support mechanisms in place such that an SCPA Article 17-A guardianship is no longer necessary.

Discussion
Although a guardianship established pursuant to SCPA Article 17-A typically continues during the life of the disabled person, SCPA 1759 provides for a proceeding to modify, amend or terminate the guardianship. 
In the instant proceeding, it is clear that the guardian no longer wishes to serve and has not done so for quite some time. The guardian, who permanently relocated to Virginia approximately two years ago and does not play an active role in petitioner's daily life, executed a waiver and renunciation indicating her consent to all of the relief sought in the petition, including termination of the guardianship. She had also previously executed a "stipulation of settlement" agreeing to termination of the guardianship, which was signed by herself, the petitioner and petitioner's counsel. The testimony indicated that the petitioner has been allowed to make his own decisions for the last two or three years when the guardian failed to appear or participate.
Further, courts in this state have recently terminated SCPA Article 17-A guardianships where the evidence demonstrates that there were less restrictive alternatives to meet the needs of the person (see Matter of Robert C.B., 207 AD3d 464; Matter of Capurso, 63 Misc 3d 725) In those matters, the court determined that it was in the best interests of the individual to terminate the guardianship and restore their full rights.
In Matter of Robert C.B., the Appellate Division, Second Department reversed the finding of the Surrogate of Dutchess County that the individual was a developmentally disabled person as a ground for denying a petition to dissolve the guardianship, while simultaneously granting the relief to terminate the guardianship of the person. The issue in that case was that after thorough research, the individual purchased a car under predatory financial terms, and then took steps to [*6]mitigate the decision. The appeals court found that the evidence demonstrated that the ability of the individual to "'understand and appreciate the nature and consequences of decisions' was not impaired". As such, the individual was not developmentally disabled as defined in SCPA Article 17-A and the entirety of the guardianship should have been terminated.
In Matter of Capurso, the Surrogate of Westchester County terminated a guardianship where the record demonstrated that the individual "has gained greater independence since moving to [a group home], as he has been able to obtain and sustain employment, manage a bank account, maintain a social life, travel independently, take care of his hygiene, and engage with a supported decision-making network." The court found that the system of supported decision-making that was in place constituted a less restrictive alternative to an SCPA Article 17-A guardianship, which permitted termination of the guardianship.
The testimony and evidence in the instant matter demonstrates that over the nine years petitioner has resided in the group home, he has matured and improved in his decision making abilities. He has support from his grandfather, his aunt, a friend, and his team of providers to aid him in decision-making processes, and he is willing to accept that support. Due to the fact that in the guardian's absence petitioner has been making his own decisions and appears to be making appropriate choices. 
The testimony and evidence further demonstrates that he is capable of living independently, making his own medical appointments, and dispensing and taking his medications on his own without the help of others. Both IGHL and Maryhaven conducted an assessment of petitioner and determined that he can stay home alone continuously without staff, he can live in an apartment and he is a person who is capable of consenting to a sexual relationship.
Presently, he takes medications on his own, handles activities of daily living without assistance, can travel alone in the community by SCAT bus to visit friends in other towns, and is employed. Not only does he prepare his own food daily, but he often cooks for others, making foods such as tacos, pizza and egg sandwiches with sausage, using the oven, microwave and air fryer.
This court agrees with the conclusions of the guardian ad litem that petitioner "has developed life skills that allow him to care for himself with moderate to minimal assistance from others." This court also agrees that it is illogical to continue the guardianship given the petitioner's residential situation, he maintains a proper daily routine, and there are sufficient support mechanisms in place such that an SCPA Article 17-A guardianship is no longer necessary.
Further, this court notes that since the petitioner's care manager works for a separate organization, not IGHL, he will still have her services when he moves. His aunt has also made it clear that she is a support for the petitioner who will undertake any necessary measures to ensure his safety and welfare should it become necessary. 

Conclusion
Accordingly, this court finds that in light of the testimony and evidence adduced at the hearing, it is in the best interests of the petitioner to terminate the guardianship. Based upon the foregoing, the petition is granted, the guardianship of the person is terminated, and the amended letters of guardianship issued on January 25, 2019, are hereby revoked.
Decree signed.
VINCENT J. MESSINA, JR., Surrogate